IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:19-CV-214-D

JACKSON FARMING COMPANY OF )
AUTRYVILLE, WILLIAM BRENT JACKSON, )
and WILLIAM RODNEY JACKSON, )
)
                      Plaintiffs, )
)
v. )      **ORDER**
)
FCCI SERVICES, INC., and NATIONAL )
TRUST INSURANCE COMPANY, )
)
                      Defendants. )

       On September 25, 2019, Jackson Farming Company of Autryville a/k/a Jackson's Farming Company of Autryville ("Jackson Farming"), William Brent Jackson, and William Rodney Jackson (collectively, "plaintiffs") filed a complaint in Sampson County Superior Court against FCCI Services, Inc. ("FCCI") and National Trust Insurance Company ("National Trust"; collectively, "defendants"), alleging breach of contract and seeking a declaratory judgment [D.E. 1-3]. On October 30, 2019, defendants removed the case to this court [D.E. 1]. On April 6, 2020, defendants moved for summary judgment [D.E. 17] and filed a memorandum in support [D.E. 18]. On April 27, 2020, plaintiffs responded in opposition [D.E. 20]. On May 6, 2020, defendants replied [D.E. 21]. As explained below, the court grants summary judgment to defendants because plaintiffs did not submit a claim within the applicable coverage period.

I.

       On March 17, 2015, FCCI issued a general liability insurance policy ("the insurance policy") that contained an "Employment Practices Liability Insurance Coverage Endorsement" ("EPL Endorsement") to plaintiffs. See Compl. [D.E.1-3] ¶ 11; [D.E. 1-4] 41–53. The EPL Endorsement

states: "For coverage to apply under this EPL Coverage, the 'wrongful employment act' must commence or take place after the Retroactive Date, but before the end of the 'EPL Coverage Period." [D.E. 1-4] 41 (emphasis added). Jackson Farming makes a claim under the EPL Endorsement when either "written notice of such 'claim' or 'suit' is received and recorded by any 'insured' or by '[FCCI]', whichever comes first;" or "'[FCCI]' make[s] any settlement in accordance with the terms of this EPL Coverage." Id. As for duties of coverage, the EPL Endorsement states that FCCI "ha[s] no duty to provide coverage under this EPL Coverage, unless there has been full compliance with all the Conditions contained in this EPL Coverage." Id. at 46. As for conditions of coverage, the EPL Endorsement required Jackson Farming, in the event of a claim or suit implicating possible coverage, to "give written notice to [FCCI] as soon as practicable and either: a. Anytime during the 'EPL coverage period'; or b. Anytime during the Extended Reporting Periods (if applicable)." Id. (emphasis added). As for an extended reporting period, Jackson Farming had the right to an extended reporting period for claims if either Jackson Farming or FCCI canceled coverage, refused to renew coverage, or renewed coverage on a basis other than claims-made or with a different retroactive date. See id. at 47–48. As for the coverage period, the EPL coverage period "means the period commencing on the effective date shown in the Supplemental Declarations of this EPL Coverage." Id. at 50. The EPL Endorsement's coverage period ran from March 17, 2015, to March 17, 2016. See id. at 15.

On December 16, 2015, former employees of Jackson Farming employed as part of the H-2A guestworker program sent a letter to William Brent Jackson and William Rodney Jackson, informing them of a soon-to-be-filed lawsuit. See [D.E. 18-3]. On February 23, 2016, these employees filed a class action lawsuit against plaintiffs in the United States District Court for the Eastern District of North Carolina, alleging, inter alia, violations of the Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 216 et seq., the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1 et

2

seq., and breach of contract. See Compl. at ¶ 15; Kisner Aff. [D.E. 18-1] ¶ 9; [D.E. 18-4] ¶ 1.[1] On March 17, 2016, the EPL Endorsement's coverage period ended. See Kisner Aff. ¶ 7. On that same date, plaintiffs renewed their policy with FCCI ("the renewal policy"), beginning a new 1-year EPL Endorsement coverage period that ran from March 17, 2016, to March 17, 2017. See [D.E. 20-2] 1. The renewal policy states:

> This insurance does not apply to "loss" arising out of a "wrongful employment act" that arises out of incidents or circumstances of which "you" had knowledge prior to the effective date of this EPL Coverage Form or the first EPL Coverage Form issued by "us" of which this EPL Coverage is an uninterrupted renewal.

[D.E. 20-2] 1.

On August 5, 2016, Jackson Farming reported a claim concerning the class action lawsuit to FCCI. See Kisner Aff. at ¶ 11. On September 26, 2016, FCCI denied the claim. See id. at ¶ 18; Compl. ¶ 20. On November 21, 2016, Jackson Farming resubmitted the claim. See Compl. ¶ 21. On November 30, 2016, FCCI again denied the claim. See Kisner Aff. ¶ 19. On December 2, 2016, FCCI, after a request for reconsideration by Jackson Farming, denied the claim for a third time. See id. at ¶ 20. On July 11, 2017, this court approved the settlement of the class action lawsuit against plaintiffs. See [D.E. 1-6]. On September 25, 2019, plaintiffs filed this lawsuit.

Plaintiffs make two claims. First, plaintiffs allege that defendants breached the insurance policy contract by failing to provide coverage to Jackson Farming in the class action lawsuit. See Compl. at ¶¶ 28–38. Second, plaintiffs seek a declaratory judgment concerning the rights, obligations, and legal interests of the parties under the insurance policy contract. See id. at ¶¶ 39–43. As for relief, plaintiffs seek declaratory relief, damages, costs, and attorneys' fees. See id. at 7.

In their motion for summary judgment, defendants argue that the EPL Endorsement bars

---

[1] Neither party filed the former employees' complaint as part of their pleadings. As part of their motion for summary judgment, defendants filed the second amended complaint, which the former employees filed on September 29, 2016. See [D.E. 18-4]. The parties agree that the former employees filed the class action complaint on February 23, 2016. See Compl. at ¶ 15; [D.E. 18] 3; Kisner Aff. [D.E. 18-1] ¶ 9.

3

coverage because plaintiffs made their claim outside the EPL coverage period. See [D.E. 18] 6–8. Plaintiffs respond that, on March 17, 2016, they renewed their EPL coverage with FCCI for a period from March 17, 2016, to March 17, 2017. See [D.E. 20] 4. According to plaintiffs, their claim concerning the class action lawsuit falls under the uninterrupted coverage provided by the renewal policy, but—at the very least—"[t]he language in the policy is ambiguous as to the EPL Coverage Dates when policy holders renew their policy without interruption in coverage." Id. at 5. Defendants reply that "[t]he clear language of the [EPL Endorsement] Policy requires that a claim be both made and reported within the same coverage period for coverage to apply[,]" and cite supporting decisions in analogous cases from several district courts. See [D.E. 21] 3–7 (emphasis in original).

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving

4

party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

The motion for summary judgment requires the court to consider plaintiffs' claims under North Carolina law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[2] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[2] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

Case 7:19-cv-00214-D   Document 24   Filed 08/24/20   Page 5 of 10

As for plaintiffs' breach of contract claim, a breach of contract claim involves two elements: (1) the existence of a valid contract and (2) breach of the terms of that contract. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A breach of a contract occurs where there is "[n]on-performance[,] . . . unless the person charged . . . shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Cater v. Barker, 172 N.C. App. 441, 447, 617 S.E.2d 113, 117 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006) (quotation omitted); see Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n, 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished). An insurance policy is a contract, and the policy's provisions govern the rights and duties of the contracting parties. See Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000); C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co., 326 N.C. 133, 142, 388 S.E.2d 557, 562 (1990). The insured party "has the burden of bringing itself within the insuring language of the policy." Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 606, S.E.2d 221, 229 (2006) (quotation omitted).

Interpreting a written insurance contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). "Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Gaston Cty., 351 N.C. at 299, 524 S.E.2d at 563 (quotation omitted); see Plum Props., LLC v. N.C. Farm Bureau Mut. Ins. Co., 254 N.C. App. 741, 744–45, 802 S.E.2d 173, 175 (2017); Mizell, 138 N.C. App. at 532–33, 530 S.E.2d at 95. When interpreting a written insurance policy under North Carolina law, "the goal of construction is to arrive at the intent of the parties when the policy was issued." Gaston Cty., 351 N.C. at 299, 524 S.E.2d at 563 (2000) (quotation omitted); see Stewart Eng'g, Inc. v. Cont'l Cas. Co., No. 5:15-CV-377-D, 2018 WL 1403612, at *3–4 (E.D.N.C. Mar. 20, 2018)

6

(unpublished), aff'd, 751 F. App'x 392 (4th Cir. 2018) (per curiam) (unpublished); Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175. Moreover, courts construe coverage clauses broadly and exclusionary clauses narrowly. See Plum Props., 254 N.C. App at 744–46, 802 S.E.2d at 175–76.

A court may engage in judicial construction only when the language used in the policy is ambiguous. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Under North Carolina law, courts construe ambiguities against the insurer and in favor of the insured. See id., 530 S.E.2d at 95. Language is not ambiguous, however, "simply because the parties contend for differing meanings to be given to the language." Id., 530 S.E.2d at 95. Rather, an ambiguity exists if the policy's language is "fairly and reasonably susceptible to either of the constructions for which the parties contend." Blis Day Spa, LLC v. Hartford Ins. Grp., 427 F. Supp. 2d 621, 630 (W.D.N.C. 2006) (quotation omitted); see Westchester Surplus Lines Ins. Co. v. Clancy & Theys Constr. Co., No. 5:12-CV-636-BO, 2014 WL 2157442, at *3 (E.D.N.C. May 23, 2014) (unpublished); see generally Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co., 359 F. Supp. 3d 306, 312 (E.D.N.C. 2019).

The parties agree that the insurance policy (including the EPL Endorsement) is a valid contract under North Carolina law. The parties disagree about whether Jackson Farming submitted a claim within the EPL Endorsement's coverage period. The EPL Endorsement's coverage period ran from March 17, 2015, to March 17, 2016. See [D.E. 1-4] 15. Jackson Farming submitted a claim concerning the class action lawsuit to FCCI on August 5, 2016, nearly five months after the expiration of the EPL Endorsement's coverage period. See Kisner Aff. at ¶ 11. Plaintiffs contend that the renewal of the insurance policy provided uninterrupted coverage from March 17, 2015, to March 17, 2017, and thus, any distinction between coverage periods is irrelevant and arbitrary. See [D.E. 20] 4–5; [D.E. 20-2]. According to plaintiffs, the only material difference between the renewal policy and the initial policy, besides the coverage dates, is the policy numbers. See [D.E. 20] 4–5. Defendants disagree and assert that because plaintiffs knew of the class action lawsuit during the

7

EPL endorsement's coverage period of March 17, 2015, to March 17, 2016, but waited until August 5, 2016 to make a claim, there is no coverage. See [D.E. 21] 4.

The EPL Endorsement is clear and unambiguous. "For coverage to apply under this EPL Coverage, the 'wrongful employment act' must commence or take place after the Retroactive Date, but before the end of the 'EPL Coverage Period.'" [D.E. 1-4] 41 (emphasis added).[3] The EPL Endorsement also required Jackson Farming to "give written notice to [FCCI] as soon as practicable and either: a. Anytime during the 'EPL coverage period'; or b. Anytime during the Extended Reporting Periods (if applicable)." Id. at 46. Moreover, "unless there has been full compliance with all the Conditions contained in this EPL Coverage[,]" FCCI has no duty to provide coverage. Id. Jackson Farming made its claim on August 5, 2016, almost five months after the EPL Endorsement's coverage period ended on March 17, 2016. See Kisner Aff. at ¶ 11. Jackson Farming reported its claim too late under the unambiguous language of the contract. Cf. Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Accordingly, even viewing the record in the light most favorable to plaintiffs, no rational jury could find that Jackson Farming made its claim within the EPL Endorsement's coverage period.

In opposition, Jackson Farming argues that the renewal policy created an uninterrupted 2-year coverage period. The court rejects the argument. In fact, the renewal policy helps defeat Jackson Farming's claim. The renewal policy states: "This insurance does not apply to 'loss' arising out of a 'wrongful employment act' that arises out of incidents or circumstances of which 'you' had knowledge prior to the effective date of this EPL Coverage Form or the first EPL Coverage Form issued by 'us' of which this EPL Coverage is an uninterrupted renewal." [D.E. 20-2] 1 (emphasis added). Contrary to Jackson Farming's argument, the renewal policy effectively bifurcates the

---

[3] No party has asserted the existence of an extended coverage period that could have prolonged Jackson Farming's window to report a claim. FCCI did not cancel coverage, did not refuse to renew coverage, or did not renew coverage with a different retroactive dates. See [D.E. 1-4] 47–48.

8

Case 7:19-cv-00214-D   Document 24   Filed 08/24/20   Page 8 of 10

coverage periods. While providing uninterrupted coverage, the renewal policy effectively creates a time limit for claims. To make a claim under either the EPL Endorsement or the renewal policy, Jackson Farming had to learn of the claim and report it to FCCI within the applicable period. See [D.E. 1-4] 46 (noting that the claim must arise during the coverage period and be made during the coverage period). For the EPL Endorsement, that coverage period ran from March 17, 2015, to March 17, 2016. See id. at 15. For the renewal policy, that coverage period ran from March 17, 2016, to March 17, 2017. See [D.E. 20-2] 1. Plaintiffs learned of the class action lawsuit when it was filed on February 23, 2016, a date that falls inside the EPL Endorsement's coverage period but outside the renewal policy's coverage period. See [D.E. 1-4] 15; [D.E. 20-2] 1.[4] Thus, Jackson Farming had "knowledge [of a wrongful employment act] prior to the effective date [i.e. March 17, 2016] of this EPL Coverage Form." [D.E. 20-2] 1. These unambiguous cutoff dates doom Jackson Farming's argument. Accordingly, the renewal policy helps to defeat, not save, Jackson Farming's claim. See Eagle Eng'g, Inc. v. Cont'l Cas. Co., 191 N.C. App. 593, 599, 664 S.E.2d 62, 66 (2008) ("Viewing the contracts as a whole it is plain that plaintiff's claim must have arisen during a covered policy period and plaintiff was required to make its claim within a covered policy period . . . , which plaintiff failed to do.").

Numerous analogous federal court decisions construing similar claims-made insurance contracts under their respective state laws confirm this court's conclusions in this case. In Checkrite Ltd., Inc. v. Illinois National Insurance Company, 95 F. Supp. 2d 180 (S.D.N.Y. 2000), the court held that a renewal of an insurance policy does not automatically extend the cutoff date for claims to be made. See id. at 191–94. The Checkrite court stressed the importance of such a cutoff date

---

[4] Plaintiffs arguably first received notice of the class action lawsuit when former employees of Jackson Farming sent the letter to William Brent Jackson and William Rodney Jackson on December 15, 2015. See [D.E. 18-3]. However, the difference between February 23, 2016, and December 15, 2015, is irrelevant. Both dates were before the effective date of the renewal policy, and plaintiffs failed to timely notify defendants of the claim.

9

for rate setting between the insurer and insured. Id. at 191–92; see generally Lee R. Russ, Couch on Insurance §§ 102:20, 102:24 (3d ed.1999). Other courts have adopted Checkrite's reasoning. See, e.g., Alaska Interstate Constr., LLC v. Crum & Forster Specialty Ins. Co., 696 F. App'x 304, 305 (9th Cir. 2017) (unpublished) (quoting Checkrite); Steinfelder v. Catlin Specialty Ins. Co., No. 12-CV-2970-JKB, 2013 WL 2147561, at *4 (D. Md. May 15, 2013) (unpublished) (citing Checkrite positively); GS2 Eng'g & Envtl. Consultants, Inc. v. Zurich Am. Ins. Co., 956 F. Supp. 2d 686, 693 (D.S.C. 2013) (adopting the Checkrite rationale as persuasive); Exec. Risk Indem., Inc. v. Chartered Benefit Servs., Inc., No. 03 C 3224, 2005 WL 1838433, at *9–10 (N.D. Ill. July 29, 2005) (unpublished) (same); but see Cast Steel Prods., Inc. v. Admiral Ins. Co., 348 F.3d 1298, 1303–04 (11th Cir. 2003) (predicting Florida law and relying upon an Ohio Court of Appeals case to hold that it would be "both illogical and inequitable to deny coverage to the insured who chooses to renew its claims-made policy for successive years with the same insurer"). This court does as well and predicts that the Supreme Court of North Carolina would adopt Checkrite's reasoning and decline to excuse plaintiffs' failure to comply with the insurance contract's plain terms.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 17]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 24 day of August 2020.

JAMES C. DEVER III
United States District Judge